UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER TONEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 24 C 50520 |
| | ) | |
| HENNIG, INC., | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

For about one month in late 2024, Plaintiff Christopher Toney ("Plaintiff" or "Toney") was employed as a temporary worker at Defendant Hennig, Inc ("Defendant"). In this role, Mr. Toney operated a CNC Bender—a machine that bends metal and requires an "operator" to run the machine's computer and a "helper" to load metal into the machine. In this employment discrimination lawsuit, Toney, who is African American, alleges that he was forced to work as the "helper" more frequently than his white coworkers. He also claims that his coworkers bullied him, listened to offensive music, and refused to allow him to operate a forklift. He was ultimately terminated, ostensibly for belligerent behavior at work, and later brought this lawsuit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981, bringing claims of race discrimination, hostile work environment, and retaliation. Defendant has moved for summary judgment. As explained below, this motion is granted.

## BACKGROUND

### I. Factual Background

The facts laid out below are taken from the parties' respective Local Rule 56.1 filings, as well as the record evidence submitted by both parties.[1] As it must at summary judgment, the

---

[1] Defendants' Local Rule 56.1 Statement of Material Facts is cited here as "DSOF [59] ¶ ___." Plaintiff's Response to Defendant's Local Rule 56.1 Statement is cited here as "Pl.'s Resp. to DSOF [61] ¶ ___." Plaintiff has also submitted an Additional Statement of Facts, cited

court takes disputed facts in the light most favorable to the non-moving party. *See In re Greenpoint Tactical Income Fund LLC*, 168 F.4th 1002, 1007 (7th Cir. 2026).

### A. Plaintiff's Work Assignments

Plaintiff Christopher Toney is African American. (DSOF [59] ¶ 1.) In 2024, he applied to work as a "machine operator or forklift driver" at Defendant Hennig, a manufacturing company, via Staff on Site, a third-party staffing agency. (*Id.* ¶ 7.) Toney interviewed with Eddie Beck, a "lead" on Hennig's morning shift. (*Id.* ¶ 8.) Toney was hired, but was assigned to work on the evening shift on a team consisting of Nick Tapp, Jeff Griebel, Matthew Ortiz, Gage Franta, and Stefon McGee. Toney and McGee are African Americans; Tapp, Griebel, and Franta are white. (*Id.* ¶ 11.) Tapp was the team lead, and he reported to Kaleb Topham, the overall production supervisor for the second shift. (*Id.* ¶ 12.) Topham reported to Nathan Hilby, the Vice President of Operations, who oversaw the shop and all employees. (*Id.*)

Plaintiff's primary job responsibility was operating the CNC Bender, a "bending machine" used to bend large metal objects. (Pl. Dep. [59-3] at 33:1–36:15.) Operation of the CNC Bender requires two workers: the first, the "machine operator," inputs a mathematical formula into a computer attached to the bender; the second, the "helper," lifts pieces of metal and places them into the machine. (DSOF [59] ¶ 14.) Plaintiff asserts that working as the machine operator is the more prestigious and desirable assignment. And Plaintiff claims he was skilled at that assignment; he immediately learned how to operate the Bender's computer, and was able to train two other employees on his first shift. (PSOF [62] ¶ 5.) In spite of this skill, he contends, his supervisors often required him to be the helper. Plaintiff asserts that he and the other African American on his shift, McGee, were assigned to be a helper more frequently than their white colleagues, and contends this is due to race. (*Id.* ¶ 10.) Defendants counter that new assignments were made based on experience and seniority, and because Plaintiff and Mr. McGee

---

here as "PSOF [62] ¶ ___." Defendant's Response to Plaintiff's Additional Statement of Facts is cited here as "Def.'s Resp. to PSOF [64] ¶ ___."

were the least experienced members of the team, it frequently fell upon them to be the helper. (Def.'s Resp. to PSOF [64] ¶ 10.)  Plaintiff does not dispute that he was the least experienced member of the team (Pl. Resp. to DSOF [61] ¶ 11), but nevertheless believes that race was the true reason that he was more frequently assigned to be a helper.

In addition to the disparate work assignments, Plaintiff contends he was not allowed to operate a forklift due to his race.  Working at Hennig involves lifting heavy objects, and use of a forklift is helpful; not using the forklift, according to Plaintiff, makes the job "significantly harder." (PSOF [62] ¶ 17.)  Plaintiff, like other temporary workers, was not certified by Hennig to operate the forklift (Pl.'s Resp. to DSOF [61] ¶ 17), but Tapp once allowed Plaintiff to use the forklift despite his lack of certification.  (*See* Pl. Dep. [59-3] at 48:3–15 ("The first time he let me use it . . . .").) When Plaintiff attempted to use the forklift on a second occasion, however, Tapp and Franta intervened, and told Plaintiff "to get off of it because he was not certified."  (DSOF [59] ¶ 18 (undisputed).)  This second intervention, Plaintiff contends, was racially motivated; he asserts that several white coworkers—who were also temporary employees and, thus, uncertified— occasionally operated the forklift without comment from Hennig supervisors, just as Plaintiff himself had done on a single occasion.  (Pl. Dep. [59-3] at 48:20–22; 49:4–17.)  It is not clear how often uncertified white coworkers attempted to operate the forklift, or if they were ever subjected to discipline for their attempts at doing so.  Plaintiff himself does not claim he was punished or disciplined for his second attempt to operate the forklift.  (*See generally* Pl. Dep. [59-3] at 45:16– 55:19.)  He later "inquired about becoming certified" to operate the forklift (PSOF [62] ¶ 16), but Hennig refused to provide certification until his temporary employment transitioned to full time employment.  (DSOF [59] ¶ 17.)

### B.  Concerns about Plaintiff's Job Performance and Interactions with Coworkers

According to Defendant, Plaintiff performed poorly during his short stint at Hennig. Defendant claims that supervisors noticed that Plaintiff failed to follow protocol, with the result that

3

other employees were required to spend time "recount[ing] panels and double check[ing] part numbers" a few times per week. (*Id.* ¶ 22.) Plaintiff acknowledges that he made mistakes, and that Topham reported concerns to Hilby about his performance. (*Id.* ¶¶ 22–24 (undisputed in relevant part).) But he claims his supervisors' assessments of his overall performance were misguided, and claims that he "demonstrated competence and proficiency" at work. (Pl.'s Resp. to DSOF [61] ¶ 23.) In support, he notes that he was asked to train other employees—although it is not clear when, how often, or which employees he trained (he does not recall their names)—and believes this "undermin[es] any assertion of substandard work." (*Id.*; Pl. Dep. [59-3] at 103:1–3.) He also claims that he was never personally informed by any supervisor that his work was not meeting Hennig's expectations. (*Id.* ¶ 25.)

Plaintiff's supervisors also noted concerns about his interactions with his coworkers. At some point, Topham reported to Hilby that Plaintiff "was having a hard time taking instructions from other employees and was butting heads with other employees." (DSOF [59] ¶ 26.) Specifically, Topham noted that Plaintiff was "confrontational and did not take feedback"; had "multiple altercations" with Ortiz, a coworker; and resisted instructions from Tapp, the team supervisor. (*Id.* ¶ 27.) While Plaintiff acknowledges that his team complained about his conduct, he claims that he pushed back against instructions because they were "issued and applied" in a disparate manner and because they came from poorly performing employees. (Pl.'s Resp. to DSOF [61] ¶ 27 (referring to Ortiz's feedback as unreliable and unnecessary).)

Plaintiff had particular trouble with one coworker, Jeff Griebel, who Plaintiff claims bullied him on two occasions on the basis of race. In the first incident, Plaintiff was operating the Bender machine's computer, and Griebel told him to switch roles because Topham had ordered that Plaintiff be the helper, and Griebel be the operator. (DSOF [59] ¶ 28.) Plaintiff complained to Topham, but Topham informed Plaintiff that Griebel was lying, and that he had ordered no such thing. Afterwards, Tapp asked Plaintiff to assist with a different task. (*Id.* (undisputed).) On the second occasion, Plaintiff arrived at work early and was working at a machine when Griebel again

4

approached him and announced, "you're going to pack your shit and you're going to move.  This is my machine." (*Id.* ¶ 29.)  Plaintiff remained at the machine, but Tapp eventually intervened and asked Plaintiff to move to a different machine because Griebel "had an attitude" and "was threatening to go home," evidently because Griebel preferred the machine that Plaintiff was using. (Pl.'s Resp. to DSOF [61] ¶ 13; *see also* Pl. Dep. [59-3] at 74:6–11.)  Shortly after, Griebel began playing what Plaintiff characterizes as offensive music on the shop's loudspeaker.[2]  (Pl. Dep. [59-3] at 79:6–10; DSOF [59] ¶ 30.)  Plaintiff did not explain in detail what he meant by the phrase, nor identify particular songs or artists in response to deposition questions, but he described the music as discussing "allegiance to the South," "white pride," and the Confederate flag.  (Pl. Dep. [59-3] at 78:17–80:1.)  As the court understands things, this music in context led Plaintiff to believe that Griebel was mistreating him due to his race.[3]  (Pl.'s Resp. to DSOF [61] ¶ 38.)

Plaintiff reported these incidents to Topham (*see* DSOF [59] ¶ 38), but precisely what he said is disputed.  Citing to Topham's deposition testimony, Defendant contends that Plaintiff's complaints made no reference to mistreatment on the basis of race.  (*Id.* ¶ 38; Topham Dep. [59-4] at 27:10–20.)  They also note that Plaintiff himself stated during his deposition that he could not "recall specifically" the contents of any reports or discussions to his supervisors, and could say only that he told Topham "what had happened," without elaboration.  (Pl. Dep. [59-3] at 76:18–77:8.)  Plaintiff insists that he did report race-based harassment to his supervisors (Pl.'s Resp. to DSOF [61] ¶ 38, PSOF [62] ¶ 19), but there is little evidence of this.  Plaintiff's Local Rule 56.1 response cites to Plaintiff's deposition testimony and his Declaration (Pl.'s Resp. to DSOF [61]

---

[2]    Plaintiff claims that videos associated with these songs "show[] the Confederate flag," but he does not say that these videos were played publicly at the workplace.  (Pl. Dep. [59-3] at 79:6–9.)  Plaintiff also acknowledges that he did not complain of offensive music in his charge with the Equal Employment Opportunity Commission.  (Pl.'s Resp. to DSOF [61] ¶ 30.)

[3]    According to Defendant, Griebel has since been terminated for "fail[ing] to meet production standards."  (DSOF [59] ¶ 13.)  In fact, *all* members of Plaintiff's team have since been fired by Defendant, for various reasons ranging from drug use, attendance issues, and "poor quality" of work.  (*Id.*)

¶ 38 (citing Pl. Dep. [59-3] at 82:7–17; Pl. Decl. [62-1] ¶ 10)), but the cited portions have nothing to do with any reports filed by Plaintiff.[4]  The only evidence the court could locate concerning reports of race-based harassment is the following incomplete sentence in Plaintiff's Declaration: "As a result, I verbally complained to Mr. Topham about the disparate treatment I was receiving with job placements and." (Pl.'s Decl. [62-1] ¶ 21.)  In any event, Hennig had procedures in place for reporting workplace harassment, and there is no evidence that Plaintiff availed himself of them. (DSOF [59] ¶¶ 5, 38–42 (undisputed in relevant part).)

Whatever communications he may have made to his direct supervisors, it appears that Plaintiff did complain of race-based harassment via text messages to Staff on Site (the temp agency that assigned him to work for Hennig) and to Eddie Beck, the supervisor of Hennig's morning shift (to which Plaintiff was not assigned).  (Pl.'s Resp. to DSOF [61] ¶ 39; DSOF [59] ¶ 9.)  One or both of these messages were sent on "September 26, 2024, beginning at 5:49 p.m." (DSOF [59] ¶ 39 (undisputed as to timing); *see also* Pl. Ex. B, Text Messages [62-2] at 1.)  One of the messages may have been sent a few minutes earlier,[5] but it is undisputed that neither Staff on Site nor Mr. Beck relayed Plaintiff's complaint to Plaintiff's supervisors or Hennig's HR team while he was still employed at Hennig.  (DSOF [59] ¶¶ 40, 41.)

### C. Plaintiff's Termination

In having his performance criticized, Plaintiff was not alone.  Defendant asserts that several members of the night shift team demonstrated poor performance and poor attendance, and engaged in drug use.  At some point—exactly when is not clear—Topham told Hilby that he

---

[4]  "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."  Local Rule 56.1(e)(3).

[5]  Screenshots of these messages in the record suggest that one of these text message reports was sent at 4:42 p.m.—i.e., roughly thirty minutes *before* Topham fired Plaintiff at 5:12 p.m. (Pl. Ex. B, Text Messages [62-2] at 7.)  The screenshot does not show who received this message or when it was received, however.  Plaintiffs' responsive Local Rule 56.1 statement does not dispute Defendant's claim that the text reports to Beck began, at the earliest, at 5:49 p.m.  (Pl.'s Resp. to DSOF [61] at ¶ 39.)  The court adopts the same understanding here.

needed to terminate several of them.  (DSOF [59] ¶¶ 13, 20, 43.)  Topham was not specific about who needed to go, but soon after "the decision to terminate was made," Topham observed that "Plaintiff appeared to be trying to start a fight with Franta."  (*Id.* ¶ 44.)  According to Defendant, the argument was over "production," and Franta said "he could not work with Plaintiff anymore." (*Id.*)  Afterwards, according to Defendant, Plaintiff sent "hostile and aggressive" text messages to Franta outside of working hours.[6]  (*Id.*)  Copies of these text messages are not in the record, but their contents were described in a statement made by Franta after Plaintiff was fired.  (*See id.* ¶ 31.)  In this statement, Franta recalled that Plaintiff

> was [] aggressive and hostile with me because I said we have to go faster and he got in my face and said "what you gonna do" and I walked away and told my supervisor.  Got through the day and then he texted me at home on the weekend saying aggressive things like I better not do this or say that, like to my supervisors. [H]e was still mad over nothing from the day before so I BLOCKED him in my phone I don't need to be harassed while im not at work about something he made up in his head.

(Def. Ex. E, Franta Statement [59-5] at 2.)  Plaintiff acknowledges that he had a dispute with Franta, but claims the fight was about a "Caucasian employee [] again removing Plaintiff from his machine to be a helper rather than a machine operator."  (Pl.'s Resp. to DSOF [61] ¶ 44.)  But in support of this assertion, Plaintiff cites to portions of his deposition testimony and Declaration that have nothing to do with the alleged fight with Franta.  He identifies no evidence or testimony that supports his alternative version of events.

After the altercation between Plaintiff and Franta, Topham decided to fire Plaintiff.  He followed the standard procedure for terminating temporary workers: he contacted Staff on Site by email, and informed them that he was firing Plaintiff for fighting with coworkers.  (DSOF [59] ¶¶ 46, 47.)  A copy of this email, sent at 5:12 p.m. on September 26, 2024 (*id.* ¶ 46), is in the record, and states as follows:

---

[6]     Plaintiff does not meaningfully dispute that he sent these messages, only pointing out that "Defendant has failed to produce the messages Plaintiff allegedly sent Franta."  (Pl.'s Resp. to DSOF [61] ¶ 45.)

> This is Kaleb Topham the night shift supervisor at hennig inc. I have an employee by the name of Christopher Tony that I need to let go. He's been confrontational with most of the employees in his department and isn't meeting production standards. Thank you, Kaleb.

(Def. Ex. F [59-6].) Typically, Staff on Site would inform the worker directly that they had been terminated. But the recipient of Topham's email was out of the office, so Plaintiff was not informed he was fired until he showed up to work on September 29, 2024. (DSOF [59] ¶¶ 48, 49.) Topham then told him that he had been terminated.

Plaintiff claims that this termination was both discriminatory and retaliatory. He says that he was never informed that he was behaving poorly at work or that his performance was not meeting his employer's standards (PSOF [62] ¶ 23), and that a white employee named Jordan was given "several chances to improve."[7] (*Id.* ¶ 24 (citing Pl. Dep. [59-3] at 61:1–6.); DSOF [59] ¶ 20.) But as Plaintiff himself acknowledges, "Jordan" was a permanent employee (Def.'s Resp. to PSOF [64] ¶ 24 (quoting Pl. Dep. [59-3] at 40:15–19)), and, accordingly, was afforded more runway prior to termination than temporary employees like Plaintiff. Plaintiff also claims that Topham's decision to terminate him was in response to Plaintiff's report of race-based harassment to Staff on Site and Mr. Beck, but he identifies no evidence suggesting that Topham was aware of Plaintiff's reporting when he made the termination decision.

By October 2, Hennig's HR team had received word that Plaintiff believed he was being discriminated against at work. (*See* DSOF [59] ¶ 31.) According to Melissa Sward, Hennig's Human Resources Director, Plaintiff sent texts to Brody Richardson, the safety manager, "about being terminated" and presumably complaining of race-based discrimination (the texts are not in the record). (Sward Dep. [59-1] at 11:12, 22:14–23:9.) Mr. Richardson then relayed those texts to Ms. Sward. (*Id.* at 23: 6–9.) In response, Hennig solicited statements from Plaintiff's coworkers, and these statements generally describe Plaintiff as a hostile and difficult individual.

---

[7]     Plaintiff refers to this individual as "Jordan," but Defendant claims that Jordan's real name is Matthew Ortiz. (DSOF [59] at 3 n.1.)

(Def.'s Resp. to PSOF [64] ¶ 28; *see* Def. Ex. E, Employee Statements [59-5].) It does not appear that any findings were made or any further action was taken as a result of this investigation.

## II. Procedural History

Plaintiff filed a complaint of race discrimination with the Equal Employment Opportunity Commission on November 13, 2024. ([1-1] at 2.) After receiving a right-to-sue letter on December 6, 2024 ([1-3]), he filed this lawsuit, bringing claims of discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and race discrimination under the Enforcement Act, 42 U.S.C. § 1981. Defendant has moved for summary judgment, and the motion is now fully briefed.

## LEGAL STANDARD

Summary judgment is appropriate if "'there is no genuine dispute as to any material fact,'" and the moving party "'is entitled to judgment as a matter of law.'" *Levitin v. Nw. Cmty. Hosp.*, 923 F.3d 499, 501 (7th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Trahanas v. Nw. Univ.*, 64 F.4th 842, 852 (7th Cir. 2023) (quoting *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022)). In considering a motion for summary judgment, the court construes the facts in the light most favorable to the non-moving party and draws "all reasonable inferences in [his] favor." *Blumenshine v. Bloomington Sch. Dist. No. 87*, 150 F.4th 882, 886 (7th Cir. 2025). "'An inference is not reasonable if it is directly contradicted by direct evidence provided at the summary judgment stage, nor is a 'conceivable' inference necessarily reasonable at summary judgment.'" *Downing v. Abbott Lab'ys*, 48 F.4th 793, 815 (7th Cir. 2022). The court does not "weigh evidence or determine the credibility of a witness's testimony." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (citation and internal quotation marks omitted). Such questions are left for the finder of fact. *Id.*

To survive a motion for summary judgment, the opposing party must "set forth specific facts showing a genuine issue for trial." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018)

(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). They must produce affirmative evidence supporting a jury finding in their favor; they may not rest on conjecture, speculation, or unsupported allegations in the pleadings. *See Anderson v. Street*, 104 F.4th 646, 651 (7th Cir. 2024); *see also Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 n.5 (7th Cir. 2021)*.*

## DISCUSSION

### I. Race Discrimination

Plaintiff first brings claims of race discrimination until Title VII of the Civil Rights Act and 42 U.S.C. § 1981. Title VII makes it unlawful to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). To survive summary judgment on his discrimination claim, Plaintiff "must produce evidence that would let a reasonable factfinder find" that his race "caused an adverse employment action." *Paterakos v. City of Chicago*, 147 F.4th 787, 795 (7th Cir. 2025); *see also Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 809 (7th Cir. 2025). Likewise, Section 1981 "affords a federal remedy against discrimination in private employment on the basis of race." *Campbell v. Forest Pres. Dist.*, 752 F.3d 665, 668 (7th Cir. 2014) (quoting *Runyon v. McCrary*, 427 U.S. 160, 172 (1976)). To survive summary judgment, Plaintiff must present evidence supporting an inference that he was mistreated because of his race. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020). Given that the elements of Title VII and Section 1981 are "largely identical," *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022), the court analyzes both in tandem.

Plaintiff contends that he (1) was "treated less favorably with discriminatory work assignments," (2) was "subjected to disparate enforcement of workplace rules," and (3) "subjected to discriminatory treatment" when he was "terminated without notice or any meaningful

10

opportunity to address or improve alleged performance issues." (Opp'n [60] at 3–5.) As explained below, these theories are not supported by the record.

### A. Work Assignments

Start with his work assignments. As an initial matter, the court is uncertain that being required to work as a "helper" on a CNC Bender machine constitutes an "adverse employment action" that is actionable under federal employment law. *Paterakos*, 147 F.4th at 796. True, the Supreme Court in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), recently lowered the bar for such claims, holding that discriminatory job transfers violate Title VII even if there is no evidence that the change was "significant." But Plaintiff "is grasping to even meet that standard." *Nanlawala v. City of Chicago*, No. 21-cv-05624, 2026 WL 884879, at *9 (N.D. Ill. Mar. 31, 2026) (Cummings, J.). Unlike the *Muldrow* plaintiff, who was reassigned to an entirely new position, 601 U.S. at 351, Plaintiff operated a CNC Bender throughout his entire tenure at Defendant, and was never transferred to a new location, moved to a different position within the same location, asked to do something entirely different than he was doing before, or permanently relegated to a less desirable role. Instead, he was simply asked occasionally to perform the less desirable of two tasks required to operate a two-man machine.

Even assuming that Plaintiff's repeated assignment as a "helper" constitutes an adverse employment action, his claim fails because there is no evidence that the assignments were based on race. Defendant has explained that helper and operator assignments were made on the basis of experience, and Plaintiff was the least senior member of his team. (DSOF [59] ¶ 15.) Plaintiff does not meaningfully dispute this. Instead, he claims that "Defendant's assertion regarding superior experience" is undermined by his skill as an operator—he notes that "all members of Plaintiffs purportedly 'more experienced' team were subsequently terminated." (Opp'n [60] at 4–5.) That all members of the team were poor performers may reflect poorly on Defendant's hiring or management practices—but for purposes of this case, the poor performance shows, at most, that basing work assignments on experience was misguided, not that it was discriminatory or

pretextual. Federal law does not impose an obligation that employers dole out work assignments based on merit. *See Galvan v. Indiana*, 117 F.4th 935, 939 (7th Cir. 2024) (explaining that a federal court does not sit as "a super personnel department that second-guesses employers' business judgments" (quoting *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 570 (7th Cir. 2017)). In any event, that his coworkers were terminated does not establish that Plaintiff was more skilled at the operator task than they were.

### B. Disparate Enforcement of Workplace Rules

Next, Plaintiff claims that Hennig's refusal to allow him to drive the forklift constitutes a violation of Title VII. In making such an argument, Plaintiff does not challenge the forklift policy itself as facially discriminatory.[8] Instead, he argues that Hennig enforced it in a disparate way; specifically, he claims that he was told not to operate a forklift without certification, while his supervisors looked the other way when also-uncertified white coworkers did the same.

Disparate enforcement of workplace policies can be actionable under Title VII. *See, e.g.*, *Huff v. Buttigieg*, 42 F.4th 638, 648 (7th Cir. 2022) (collecting cases). These cases typically involve an employer's imposing of discipline on members of a protected class while overlooking similar infractions on the part of other workers—or, less frequently, invoking a rarely enforced workplace policy as a rationale for firing or harshly punishing an employee of a protected class. *See, e.g.*, *Statler v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290 (7th Cir. 1999) (involving termination of an employee for stealing after employee ate abandoned food in company breakroom). This case is different. Here, Plaintiff suffered no punishment or discipline at all for his operating of the forklift. The first time he operated the forklift, he was not penalized. The second time, he was

---

[8] If he had made such an argument, the court doubts it would be successful. Allowing white employees to use a tool that makes their jobs easier, and denying that same benefit to African American employees, constitutes disparate treatment, but that is not what happened here. Plaintiff claims that he was allowed to use the forklift on one occasion, but was told to stop on his second attempt. (Pl. Dep. [59-3] at 48:8–15; DSOF [59] ¶ 18.) He does not appear to have tried again. Plaintiff asserts that white coworkers were allowed to use the forklift more often than he was, but he could not say how often this occurred beyond estimating that one coworker used it between two and four times. (Pl. Dep. [59-3] at 48:22.)

told to stop by Tapp and Franta, and did stop, again without any further repercussions. (Pl. Dep. [59-3] at 46:24 ("But I got off and listened to him."); DSOF [59] ¶ 18.) Plaintiff cannot claim disparate enforcement of rules when he was not disciplined for violating them.

Plaintiff claims that his white coworkers also operated the forklift without repercussions, evidently more frequently than Plaintiff did, and that Plaintiff's team lead (Mr. Tapp) was aware of this illicit forklift use. The court assumes that neither Plaintiff nor any coworkers should have been permitted to operate the forklift without certification, but Plaintiff was not disciplined for having done so and has not otherwise explain how he was harmed. Tapp should have enforced the rules equally, and Plaintiff believes his failure to do so is evidence of race bias. But Tapp was not otherwise a decisionmaker in this case and there is no evidence that he played a role in the decision to terminate Plaintiff (discussed below). Indeed, it is not clear to the court that Tapp, as team lead, had the authority to enforce the forklift policy at all; there is no evidence that he disciplined anybody for misuse of the equipment and it appears that his supervisory role was in fact very limited. (Sward Dep. [59-1] at 47:19–22 (explaining that team leads do not have authority to terminate, promote, or transfer an employee).) Topham, the shift supervisor, had the authority to enforce the policy, but it is undisputed that Topham "never saw anyone not forklift certified driving the forklift." (DSOF [59] ¶ 18; Pl.'s Resp. to DSOF [61] ¶ 18.)

The evidence does not establish that Plaintiff was harmed by disparate enforcement of a workplace rule.

### C. Termination

Finally, Plaintiff characterizes his termination as discriminatory because he was given no "meaningful opportunity to address or improve alleged performance issues." (Opp'n [60] at 5.) The only evidence he cites to support discriminatory animus is his own testimony that a white employee, "Jordan," was given "multiple chances to improve" prior to termination. (Opp'n [60] at 5; Pl. Dep. [59-3] at 60:17–61:6.) Plaintiff explained, in his deposition, that Jordan mentioned having been put on a performance improvement plan, evidently for attendance issues at work.

13

(Pl. Dep. [59-3] at 57:1–24.)  But Plaintiff acknowledges that Jordan was a permanent employee (*Id.* at 40:18–21), and thus enjoyed more job protections than temporary employees like Plaintiff (Def. Resp. to PSOF [64] ¶ 24).  A similarly situated employee is one "whose performance, qualifications, and conduct are comparable in all material respects."  *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (citing *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 463 (7th Cir. 2014)). Permanent and temporary employees are materially different, and Plaintiff identifies no comparable temporary employees who were provided an opportunity to improve prior to being terminated.  He has thus offered no evidence that he was treated differently on account of his race with respect to the termination of his employment.

## II.    Hostile Work Environment

Plaintiff also claims that his treatment at Hennig constitutes a hostile work environment. (Opp'n [60] at 9.)  Under Title VII, an employer is liable for a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Jones v. Das*, 164 F.4th 1024, 1032 (7th Cir. 2026) (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)).  In considering whether the conduct rises to the level of a hostile work environment, courts utilize a "totality of the circumstances approach," *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022), and consider a variety of factors, including "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance."  *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016); *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636–37 (7th Cir. 2019).  While the environment need not be "hellish," "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not enough. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted); *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) ("[A] workplace need not be 'hellish' to constitute a hostile work environment").

14

Taking the facts in the light most favorable to Plaintiff, he was: (1) forced to be a "helper" instead of an operator; (2) bullied by a coworker who twice attempted to take a machine where Plaintiff was already working, (3) forced to listen to allegedly offensive music played by his coworkers; and (4) prohibited from using the forklift. (Opp'n [60] at 10.) There is no evidence that these incidents were motivated by race, nor is it clear that they meet the bar necessary for a hostile work environment. *See Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) ("Title VII does not set forth a general civility code for the American workplace." (cleaned up)).

The court need not decide that issue, however, because there is no basis here for holding Defendant Hennig liable. Under Title VII, employers can be held liable for a hostile work environment premised on coworker harassment only if the employer behaved negligently "either in discovering or remedying the harassment." *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017). To show negligence, an employee generally must show that the employer had "notice or knowledge of the harassment"—that is, that the employer had "'enough information so that a reasonable employer would think there was some probability' of the harassment" occurring. *Equal Emp. Opportunity Comm'n v. Vill. At Hamilton Pointe LLC*, 102 F.4th 387, 403 (7th Cir. 2024) (quoting *Durkin v. City of Chicago*, 341 F.3d 606, 612 (7th Cir. 2003)). Plaintiff has identified only one example of an internal report he made: a text message sent to Mr. Beck, an employee on a different shift who did not supervise Plaintiff.[9] It is undisputed that Beck never passed along Plaintiff's complaint to HR or any of Plaintiff's supervisors.[10] (DSOF

---

[9] Plaintiff also claims that he notified Staff on Site, his staffing company, via text message. This report is not sufficient to hold *Hennig* liable, however, because there is no evidence that Staff on Site passed the information along to Hennig.

[10] Plaintiff ostensibly disputes this fact, stating that "Eddie [Beck] responded to Plaintiff indicating receipt of Plaintiff's complaint." (Pl. Resp. to DSOF [61] ¶ 40.) But there is no evidence in support of this fact, as Plaintiff only cites to three unrelated sources that do not stand for the proposition made. One concerns a text conversation between Plaintiff and an employee of Staff on Site (not Hennig) (Pl. Dep. [59-3] at 98:7–10); the second concerns texts between Hilby and Topham, but says nothing about the content of those messages, or any texts with Plaintiff (Hilby Dep. [59-2] at 19:14–16); and the third is not about text messages at all. (Pl. Decl. [62-1] ¶ 27.)

[59] ¶ 40 (undisputed in relevant part).)  It is not clear why Plaintiff chose to report to Beck instead of an HR representative or an employee in his chain of command—in a text message he sent on September 27 (the day after the discharge decision), he stated that he did not "wanna place a formal complaint because of the attention that would attract towards me."  (Text Messages [62-2] at 3.)  Because an employee is generally expected to follow employer "procedures for reporting complaints about harassment," *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 867 (7th Cir. 2013), Plaintiff's decision to informally complain to a coworker who was not his supervisor, in this context, is not sufficient to put Hennig on notice of the alleged harassment.

Moreover, if the text messages did put Hennig on notice, there is no evidence that Hennig was negligent in its response.  As explained above, taking the evidence in the light most favorable to Plaintiff, the text message to Beck was sent, at the very earliest, 5:49 p.m.—roughly thirty minutes after Topham fired Plaintiff at 5:12 p.m.  (Pl.'s Resp. to DSOF [61] ¶ 39.)  While Plaintiff did not learn of his termination until a few days later, Hennig's duty to respond to workplace harassment of Plaintiff was limited by Plaintiff's departure from the company.

Plaintiff counters by making the spurious claim that he told Topham, his supervisor, about race-based harassment in a verbal conversation that took place shortly after his second altercation with Mr. Griebel.  (Pl.'s Resp. to DSOF [61] ¶ 38.)  Plaintiff has cited two portions of the record: (1) his own deposition (Pl. Dep. [59-3] at 82:7–17), and (2) his own Declaration (Pl. Decl. [62-1] ¶ 10.)  Neither supports his position: the cited portion of his deposition concerns Plaintiff's belief that he was "being assigned harder work based upon [his] race"—not any communication he had with Topham.  In his Declaration, similarly, Plaintiff states that he felt Griebel's "comments were pervasive as I felt his attitude towards me and wanting me to be reassigned was related to my race and not my performance"; he makes no mention of having reported these feelings to Topham.  (Pl. Decl. [62-1] ¶ 10.)  To the contrary, Plaintiff testified in his deposition that he could not recall the contents of his conversations with Topham, and he

16

never suggests that he made Topham or another supervisor aware that he felt he was experiencing racism at the hands of Griebel.  Summary judgment is warranted on Count II.

### III.      Retaliation

Finally, Plaintiff claims he was terminated in response to the text messages he sent to Staff on Site and Eddie Beck.  In addition to prohibiting discrimination, Title VII also makes it unlawful for an employer to retaliate against their employees for complaining about harassment or discrimination.  42 U.S.C. § 2000e-3(a).  To advance to trial on this claim, Plaintiff must provide evidence from which a reasonable fact finder could conclude that (1) he "engaged in activity protected by the statute"; (2) he "suffered an adverse employment action"; and (3) the protected activity caused the adverse action.  *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023).

Plaintiff cannot proceed to trial on this claim, either, for two reasons.  First, there is no evidence that Plaintiff engaged in protected activity prior to his termination.  Plaintiff's complaints of race-based harassment were made by text messages beginning at 5:49 p.m. on September 26, 2024 (DSOF [59] ¶ 39 (undisputed as to timing)), but Topham emailed Staff on Site of the decision to fire Plaintiff thirty minutes earlier, at 5:12 p.m.  Topham's firing of Plaintiff could not have been motivated by retaliatory animus if the protected activity occurred after the decision to terminate had been made.  While Plaintiff claims that he reported harassment to Topham verbally in an earlier interaction, as explained above, there is no evidence of that.  Second, *even if* Plaintiff's text message complaints were sent prior to the termination decision being made, there is no evidence that Topham—who both parties agree made the decision to terminate—was aware that complaints had been made.  A Title VII retaliation claim cannot proceed absent evidence that the decisionmaker was aware of protected activity.  *See Anderson*, 104 F.4th at 655 ("The decisionmaker . . . must be aware of the protected activity to establish a causal connection."); *see also King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (same).  That is not the case here.

**CONCLUSION**

The motion for summary judgment [57] is granted.  The Clerk is directed to enter judgment

in favor of Defendant and against Plaintiff.

ENTER:

Dated: May 18, 2026

REBECCA R. PALLMEYER
United States District Judge

18